## Appeal of Liberty Agency Co.

Docket No. 6257.    Promulgated December 14, 1926.

1. Taxpayer was not entitled to classification as a personal service corporation for the year 1919.

2. Taxpayer kept its books upon the accrual basis. In 1918 The Insurance Corporation, having 6,000 of its shares of stock of the par value of $25 a share for sale at $37.50 a share, and the taxpayer entered into a contract under the terms of which the taxpayer paid to The Insurance Corporation $45,000 in cash for the said 6,000 shares and agreed to pay to The Insurance Corporation the balance—$30 a share in cash or notes on or before September 10, 1920, which time limit was later extended to January 1, 1922. The 6,000 shares were forthwith issued by The Insurance Corporation to the taxpayer and the latter immediately endorsed these shares in blank and returned them to The Insurance Corporation to be held by it as a guarantee for the unpaid balance of $30 a share. It was comtemplated that the taxpayer would sell the 6,000 shares to the public at $50 a share for cash, or 25 per cent in cash and interest-bearing prom'ssory notes for the balance, and with such cash or notes discharge its obligation to pay The Insurance Corporation the additional $30 a share and retain as its profit on the transaction the amount of $12.50 a share, and that upon receipt by The Insurance Corporation of the balance of $30 a share in cash or in notes it would release and transfer to the person or persons designated by the taxpayer the number of shares thus paid for. It was further agreed between the parties that, if the taxpayer did not assign the 6,000 shares or cause the same to be paid for as above mentioned within the time prescribed, The Insurance Company might, at its option, declare that portion of the $45,000 cash paid at the ratio of $7.50 a share for all of the 6,000 shares, which the taxpayer had not assigned or paid for as provided, forfeited as liquidated damages, and retain the unsold shares in satisfaction of taxpayer's obligation to pay the balance of $30 a share. *Held,*

that taxpayer was not entitled to deduct from gross income for the calendar year 1919 the amount of $11,707.50, being $7.50 a share on 1,561 shares of The Insurance Corporation's stock which it had not sold to the public at the close of the year 1919, upon the ground that if it should not pay for these shares on or before January 1, 1922, that amount might, at the option of The Insurance Corporation, become forfeited.

3. One J. J. Howard was promoter and sales manager of the taxpayer. In connection with the above-mentioned contract the taxpayer's directors adopted a resolution which provided that upon completion of the contract with The Insurance Corporation it would pay to Howard $25,000. This resolution was rescinded in April, 1920. *Held,* that the taxpayer was not entitled to deduct from gross income for 1919, as an accrued expense, the amount of $16,243.83, representing $4.16⅔ a share on 3,899 shares of The Insurance Corporation's stock sold during the year.

4. Taxpayer sold the stock at $50 a share and required purchasers to whom sold to pay 25 per cent of the purchase price in cash and give interest-bearing promissory notes for the balance. *Held,* that taxpayer was not entitled to reduce gross income for 1919 in the amount of $2,562.50, representing the amount of unpaid notes at December 31 of that year.

5. The taxpayer realized no taxable gain upon the purchase of its own preferred stock for an amount less than the amount at which it had theretofore sold it.

*F. W. McReynolds, Esq.,* for the petitioner.
*J. Arthur Adams, Esq.,* for the Commissioner.

This appeal is from the determination of a deficiency in income and profits tax in the amount of $14,253.94 for the calendar year 1919. Petitioner filed a personal service corporation return. The only issue before the Commissioner was whether it was entitled to classification as a personal service corporation. He denied it such classification and computed the deficiency upon the net income of $55,354.53, determined upon the accrual basis as shown in the return. He determined the profits tax under the provisions of section 328 of the Revenue Act of 1918. In its petition filed with this Board the petitioner claims (1) that it should be classified as a personal service corporation, (2) that if the Board should hold that it was not entitled to classification as a personal service corporation, its gross income should be adjusted as follows:

(a) There should be deducted from the total gross profit on stock of The Insurance Corporation sold during the year $11,707.50, representing $7.50 a share on 1,561 shares of The Insurance Corporation's stock which it had not sold at the close of the year 1919, for the reason that, if it did not pay The Insurance Corporation the remaining amount of $30 a share for these shares on or before January 1, 1922, The Insurance Corporation might, at its option, declare the $7.50 a share forfeited as liquidated damages and The Insurance

Corporation would also retain such stock as the petitioner had not paid for.

(b) The petitioner, having agreed to pay its sales manager a bonus of $25,000 upon the completion of the contract with The Insurance Corporation and the sale of 6,000 shares of the stock of that corporation, $16,245.83, or $4.16⅔ a share, should be charged against the gross profit of $12.50 upon each share of stock sold during the year as an accrued expense to take care of its contingent liability to pay this bonus.

(c) There should be excluded from gross income the amount of $2,562.50, representing promissory notes given by purchasers of stock which had not been fully paid at December 31, 1919.

(d) There should be excluded from gross income the amount of $5,025, entered upon petitioner's books as a profit as a result of the retirement of 201 shares of its preferred stock of the par value of $20,100 by delivering in exchange therefor 402 shares of stock of The Insurance Corporation costing it only $15,075.

### FINDINGS OF FACT.

The petitioner is an Iowa corporation organized in August, 1918, with principal office at Dubuque. It kept its books on the accrual basis. The purposes for which it was created were stated in its articles of incorporation as follows:

The business of the Corporation shall be the management, conduct and control of a general agency business. It may take over, continue, manage, control, conclude, dispose of, and close out the business of other agencies, corporations, associations, copartnerships or individuals. It shall have the right to buy and sell such stocks, bonds, securities as may be legally sold in this state, and evidences of indebtedness, for itself and for others. It may own, hold, sell, or encumber real and personal property, and do all things incident or necessary to the proper management and control of its business, and exercise and enjoy all the rights, privileges and franchises of corporations organized under the laws of the State of Iowa.

Its authorized capital stock was $50,000, divided into 250 shares of common and 200 shares of preferred stock. The preferred stock carried a dividend of 7 per cent. Fifty thousand dollars was paid in. On March 18, 1919, article 4 of the articles of incorporation was changed and the authorized capital stock was increased to $100,000 par value, consisting of 1,000 shares of the par value of $100 each, all common. On April 15, 1919, a common stock dividend of $25,000 was declared and paid, making the total issued and outstanding common stock 500 shares. On the same date a resolution was adopted ordering the retirement of the outstanding preferred stock, consisting of 201 shares, and this stock was forthwith purchased by the corporation in the manner hereinafter set forth.

The names of the stockholders and the amount of stock owned (the preferred stock mentioned having been purchased by the corporation in April, 1919), the time devoted to the business by the stockholders, and the salary or commission paid to each in 1919 are as follows:

| Name. | Common shares. | Preferred shares. | Official position. | Time devoted. | Fees or salary paid. | Commission paid. |
|---|---|---|---|---|---|---|
| A. J. Schmid | 6 | 10 | Sec. and Treas | Entire | $860.00 | |
| J. J. Howard | 130 | 5 | Mgr | do | 2,700.00 | |
| Irene Beringer | 1 | 0 | Asst. Treas | do | 1,187.50 | $125.00 |
| F. D. Ferring | 21 | 10 | None | do | 1,901.60 | |
| W. Schroeder | 98 | 16 | Pres | Part | 10.00 | |
| Peter Even | 72 | 20 | V. Pres | do | 10.00 | |
| F. A. Henker | 12 | 10 | Director | do | 5.00 | |
| C. G. Ruhland | 8 | 10 | Secretary | do | 130.00 | |
| E. F. Lusch | 12 | 0 | Treas | do | 5.00 | |
| J. P. Even | 34 | 10 | | do | None. | 600.00 |
| H. P. Lemper | 6 | 10 | | None | None. | |
| A. L. Pfiffner | 6 | 10 | | do | None. | |
| J. P. Schroeder | 9 | 10 | | do | None. | |
| G. W. Schroeder | 17 | 10 | | do | None. | |
| H. Henker | 6 | 10 | | do | None. | |
| J. Meuser | 6 | 10 | | do | None. | |
| M. C. Ferring | 6 | 10 | | do | None. | |
| A. L. Schmitt | 6 | 10 | | do | None. | |
| H. L. Becker | 12 | 10 | | do | None. | |
| Mrs. C. Gonner | 6 | 10 | | do | None. | |
| J. R. Portz | 5 | 0 | | do | None. | |
| J. N. Portz | 5 | 0 | | do | None. | |
| C. W. Gilham | 6 | 0 | | do | None. | |
| Maurice Brown | 10 | 10 | | do | None. | |
| J. M. McFadden | 0 | 10 | | do | None. | |
| | 500 | 201 | | | 6,809.10 | 725.00 |

The first four stockholders above mentioned, who owned 158 shares, devoted all of their time to the conduct of the business and received compensation for services rendered in 1919, either as salary or commission. The next six stockholders in the order above given, who owned a total of 236 shares, or approximately 47 per cent of the total capital stock outstanding, served the petitioner either as officers and directors, or assisted it by suggesting the names of prospective purchasers of The Insurance Corporation stock and occasionally going with salesmen to see some of them. They were paid a small amount of compensation for the services rendered in the form of "Directors' Fees." They were not regularly engaged in the active conduct of the petitioner's business. Each of these stockholders' vocation was in a business unrelated to that conducted by the petitioner. The last fourteen of the stockholders above mentioned, who owned 106 shares of the total outstanding capital stock, rendered no service and devoted no time to the business of the petitioner. Salesmen who were not stockholders were employed to sell stock, and they sold or assisted in the sale of stock to the extent of about 15 per cent of the total stock sold. J. J. Howard severed his connection with the company in July, 1920, before the terms of the contract hereinafter mentioned had been carried out or terminated.

The greater part of petitioner's income for 1919 was derived from the sale of the capital stock of The Insurance Corporation which it purchased under an agreement reading as follows:

THIS AGREEMENT Made and entered into by and between The Insurance Corporation, a corporation organized and existing under and by virtue of the laws of the State of Delaware, hereinafter described as party of the first part, and the Liberty Agency Company, a corporation organized and existing under and by virtue of the laws of the State of Iowa, hereinafter described as party of the second part.

WITNESSETH:

WHEREAS THE Insurance Corporation has for sale Six Thousand (6,000) shares of its capital stock at Thirty-seven Dollars and Fifty Cents ($37.50) per share, and

WHEREAS, The Insurance Corporation has on file with the proper authorities in the State of Iowa a prospectus which states among other things that " after a certain portion of that capital stock has been sold they would increase the price of their capital stock to an amount justified by the millions of insurance they are to receive as outlined by their prospectus, copy of which is on file with the Iowa Banking Department.

The Board of Directors of The Insurance Corporation have authorized their President to receive subscriptions for the capital stock of said corporation at Fifty ($50.00) Dollars per share on and after September Tenth, 1918, Twenty-five ($25.00) Dollars of said sum to be capital and Twenty-five ($25.00) Dollars surplus, and

WHEREAS, the Liberty Agency Company, known as party of the second part, is organized under the laws of the State of Iowa and authorized by its charter to deal in the stocks of other corporations which are licensed by the State of Iowa, and

WHEREAS, the Insurance Corporation is licensed to sell its stock in the State of Iowa,

Now, THEREFORE, In consideration of the premises and the mutual agreements of the parties herein, each to be kept and performed, and the further consideration of One ($1.00) Dollar each to the other in hand paid, receipt of which is hereby acknowledged, the party of the first part herein mentioned agrees to issue to the party of the second part Six Thousand (6,000) shares of its capital stock under the following conditions and terms:

The Six Thousand (6,000) shares shall be issued immediately upon the receipt of Forty-five Thousand ($45,000.00) Dollars in cash, receipt of which is hereby acknowledged. The Liberty Agency Company shall immediately endorse in blank the certificates for stock and return same to the Insurance Corporation to be held as a guarantee for the full payment of said Six Thousand (6,000) shares. The party of the first part hereby agrees to transfer any number of shares from one to six thousand to any person said second party may designate upon receipt of Thirty ($30.00) Dollars per share paid in cash or notes by the party of the second part or its said assigns. In accepting said notes of the said assigns of the party of the second part the party of the first part releases the party of the second part from any obligation of payment thereof.

IT IS AGREED That if by September 10, 1920, the party of the second part has not assigned the whole of the Six Thousand (6,000) shares herein mentioned and caused the same to be paid for in the manner aforesaid, the party of the first part, may at its option, declare that the portion of the Forty-five Thousand ($45,000.00) Dollars cash paid at the ratio of Seven Dollars and Fifty

Cents ($7.50) per share for each of the Six Thousand (6,000) that have not been assigned and paid for as per the conditions of this contract forfeited as liquidated damages, and the party of the first part agrees that it shall not hold the party of the second part or any of its officers for any further payments, but will accept the assignment back to the Treasurer of the Insurance Corporation of the number of shares left unassigned in full settlement for the payment of the Six Thousand (6,000) shares herein mentioned.

IN WITNESS WHEREOF the party of the first part has caused these presents to be assigned by its President and the party of the second part has caused same to be executed by its Secretary this the 6th day of September, A. D. 1918.

> THE INSURANCE CORPORATION
> By (Signed)      JNO. S. BARDWELL, *President*.
> THE LIBERTY AGENCY COMPANY OF IOWA,
> By (Signed)      A. J. SCHMID.

It is hereby mutually understood by the parties mentioned in this contract that it be extended to January 1st, 1922.

> THE INSURANCE CORPORATION
> By (Signed)      JNO. S. BARDWELL, *Pres.*

Petitioner used $45,000 of its capital paid in for making the original payment of The Insurance Corporation for 6,000 shares of its common stock in accordance with the terms of the above-mentioned agreement; the remainder of its capital was employed to pay commissions, salaries, and other expenses.

The 6,000 shares of The Insurance Corporation's stock of the par value of $25 a share were forthwith issued to the petitioner and it immediately endorsed the same in blank and returned it to The Insurance Corporation to be held as a guarantee for the payment of the remaining $30 a share, and the petitioner immediately launched a campaign to sell 6,000 shares to the public. J. J. Howard who had promoted and organized the petitioner was sales manager. The petitioner was also engaged in writing fire insurance, but this branch of its business produced only a small portion of its income. Upon the execution of the agreement with The Insurance Corporation hereinbefore mentioned, a special meeting of the petitioner's directors, was held at which the following resolution was adopted:

Meeting called to order by President William Schroeder. On motion of F. D. Ferring the purchasing of 6,000 shares of stock of The Insurance Corporation was bought, as per contract in the custody of the Secretary. It was agreed to pay J. J. Howard the sum of $25,000.00, said sum to be paid at the completion of said contract. The President ordered the Treasurer to draw check for $45,000.00 as per contract in the custody of the Secretary. There being no further business the meeting was adjourned.

At some time subsequent to the adoption of this resolution the words " purchasing of " were crossed out and the words " right to sell " were inserted. These changes were made, without the knowledge or authority of the board of directors or any member thereof, by the then bookkeeper, C. G. Ruhland, who was some time subsequently made secretary. No action was ever taken by the board of

directors to approve the change made in the resolution by the book-keeper.

During the period from August to December, 1918, the petitioner sold 540 shares of The Insurance Corporation's stock and during the calendar year 1918 it sold 3,899 shares; 402 shares of this number were given by the petitioner to its preferred stockholders in exchange for 201 shares of its preferred stock. Each share of the par value of $25 was sold to the public for $50 a share and every purchaser signed a contract specifying the number of shares for which he had subscribed. Many subscribers paid cash for the stock and in such cases the number of shares purchased were forthwith delivered. In other cases 25 per cent of the purchase price of $50 a share was paid in cash, and interest-bearing promissory notes falling due from 30 days to 12 months or longer, depending upon the circumstances, were given for the balance. The majority of the notes were for short periods. When the purchaser failed to pay the notes when due, petitioner was authorized to cancel the subscription contract and retain the cash payment of 25 per cent, and this course was pursued by the petitioner. No stock was delivered to the purchaser until the notes had been fully paid. In some cases the petitioner passed the notes along to The Insurance Corporation and they were applied by The Insurance Corporation against the balance due it by the petitioner for the 6,000 shares. When the petitioner made payment of $30 a share to The Insurance Corporation in cash or notes, the number of shares thus paid for were either delivered to the petitioner and by it assigned to the purchaser, or such number of shares were transferred and reissued by The Insurance Corporation to the person designated by the petitioner. So far as the record discloses the notes of purchasers of stock were the equivalent of cash; they were so treated by the petitioner on its books of account, that is to say, when a sale was made and notes given by the purchaser for three-fourths of the purchase price, a profit of $12.50 was accrued by the petitioner upon its books.

The petitioner's gross income for the calendar year 1919, after eliminating the amount of $5,025 treated by the petitioner as a profit upon the purchase of its own preferred stock which it had theretofore sold for $100 a share at a cost of only $37.50 a share, and the deductions to which it was entitled for the calendar year 1919, were as follows:

GROSS INCOME.

| | |
|---|---|
| Profit on sale to the public of 3,497 shares of The Insurance Corporation's stock | $43,712.50 |
| Profit on F. D. Ferring, Trustee, stock sales | 8,418.00 |
| Interest received | 2,753.29 |
| Insurance premiums | 1,593.67 |
| Discount | 737.55 |
| Total gross income | $57,215.01 |

DEDUCTIONS.

| | |
|---|---:|
| Commissions | $2,042.50 |
| Officers' salaries | 5,441.60 |
| Salaries of employees | 2,949.10 |
| Exhaustion, wear and tear, furniture and fixtures | 184.67 |
| Exhaustion, wear and tear, automobiles | 300.00 |
| Miscellaneous expense | 993.95 |
| Interest paid to The Insurance Corporation | 239.84 |
| Miscellaneous interest paid | 839.46 |
| Light and telephone | 151.87 |
| Office rent | 600.00 |
| Stationery and postage | 474.22 |
| Automobile expense | 602.63 |
| Total | $14,819.84 |
| Net income | 42,395.17 |

At a meeting of the petitioner's directors on April 12, 1920, the agreement contained in the resolution hereinbefore mentioned to pay J. J. Howard the sum of $25,000 upon the completion of the contract with The Insurance Corporation was rescinded by resolution as follows:

It was moved and seconded that in order to clear the records that the $25,000.00 contract mentioned in the minutes of September 3, 1918, which has never been in force, be hereby declared rescinded. The motion was unanimously adopted.

No part of the $25,000 was at any time paid to Howard.

During 1920 and 1921 petitioner continued to sell the stock of The Insurance Corporation and to write fire insurance policies. In December, 1921, petitioner sold the fire insurance agency feature of its business and ceased operations altogether but did not dissolve. No further effort was made to dispose of the remaining unsold shares of stock of The Insurance Corporation and no further payments were made by the petitioner to The Insurance Corporation on the unpaid balance of $30 a share for the shares which it had not sold to the public. About the same time, December, 1921, The Insurance Corporation discontinued its business. The option mentioned in the contract between The Insurance Corporation and the petitioner was never exercised by the former, and no notice was ever given to the petitioner by The Insurance Corporation of its intention to forfeit the amount of $7.50 a share on the number of shares for which the petitioner had not paid the balance of $30 a share.

At a special meeting of the petitioner's directors on April 15, 1919, a resolution was adopted ordering that the preferred stock " be retired in accordance with change in Article 4 of the Articles of Incorporation," which resolution increased the capital stock to $100,000 par value, all common. Immediately thereafter the petitioner delivered to its preferred stockholders 402 shares of the stock of The Insurance Corporation of the par value of $25 a share for which it had paid

$37.50 a share in exchange for its 201 shares of preferred stock which its stockholders had theretofore purchased at $100 a share. The 402 shares of The Insurance Corporation's stock were a part of the 6,000 shares required by the petitioner under the contract. The market price of The Insurance Corporation's stock at the time of its exchange for the preferred stock was $50 a share and the petitioner entered upon its books a profit of $5,025, representing $12.50 a share on each of the 402 shares delivered to its preferred stockholders in exchange for the preferred stock held by them in the petitioner corporation.

#### OPINION.

LITTLETON: The issues presented are (1) whether the petitioner was a personal service corporation, (2) whether gross income for the year should be reduced in the amount of $11,707.50, representing $7.50 a share paid The Insurance Corporation on the number of shares which the petitioner had not sold to the public at the end of the year, (3) whether the gross income resulting from a profit of $12.50 a share on each share of The Insurance Corporation's stock sold during the year should be reduced in the amount of $16,245.83, representing $4.16⅔ a share, on account of the agreement to pay J. J. Howard a bonus of $25,000 upon the completion of the contract with The Insurance Corporation, (4) whether unpaid promissory notes given by purchasers of The Insurance Corporation stock in the amount of $2,562.50 at the end of the year should be excluded from gross income, and (5) whether petitioner realized a taxable profit of $5,025 upon the exchange of 402 shares of The Insurance Corporation's stock, costing it $37.50 a share, or $15,075, for its 201 shares of preferred stock which it had theretofore sold for $100 a share or $20,100.

The Board is of the opinion that the petitioner was not entitled to classification as a personal service corporation for 1919. The record discloses that stockholders owning about 32 per cent of stock outstanding during the taxable year devoted their entire time to the business; stockholders owning 47 per cent of stock were not regularly engaged in the active conduct of the affairs of the corporation. The services rendered by them consisted principally of suggesting the names of persons who might purchase stock. Some of this group served as officers and directors but each was engaged in business entirely unrelated to that of petitioner to which he devoted the greater part of his time. The balance of the stockholders, owning 21 per cent of the stock, devoted no time to petitioner's business. The salesmen who were not stockholders were employed and were responsible for about 15 per cent of the stock sales during the year. In these circumstances, it can not be said that petitioner's income may be ascribed primarily to the activities of its principal stock-

holders. Petitioner used $45,000 of its capital with which to make the initial payment on the purchase by it of 6,000 shares of stock of The Insurance Corporation without which it would not have had the stock to sell. In addition petitioner used its capital to pay commissions and salaries. In these circumstances, we are of opinion that capital was a material income-producing factor.

We fail to find merit in petitioner's claim that gross income for 1919 should be reduced in the amount of $11,707.50, representing $7.50 a share paid The Insurance Corporation for stock which the petitioner had not sold at December 31, 1919. In 1918 the petitioner purchased 6,000 shares of stock at $37.50 a share and made a cash payment of $45,000 equal to $7.50 a share. This stock was issued to the petitioner and endorsed by it in blank and returned to the corporation as a guarantee for the payment of the remaining purchase price of $30,000. The option given The Insurance Corporation to declare a forfeiture of the cash payment in the event the balance on the purchase price should not be paid on or before January 1, 1922, could not have been exercised under the conditions existing during and at the end of the year 1919. The petitioner was not therefore entitled to reduce the profits on the sale of stock made to the public during the year by any portion of the amount which it had paid or obligated itself to pay for the shares of stock which had not been sold at December 31, 1919.

The agreement of the petitioner, embodied in the resolution adopted in 1918, to pay J. J. Howard $25,000 upon completion of the contract with The Insurance Corporation did not give rise to a deduction from gross income for 1919. The petitioner's liability for any amount under this contract was dependent entirely upon future contingencies. The contract did not provide, and there is no evidence to show, that Howard was to receive $4.16⅔ of the profit on each share of stock sold. The amount was payable in whole or not at all. The decision of the Board in the *Appeal of Block & Kohner Mercantile Co.*, 4 B. T. A. 673, is to be distinguished from this case. There the contract provided that one-third of the profits for three years should belong to Weinbach, and that such portion of the profits, subject to adjustment on account of losses over the period, should be paid to him upon the expiration of the contract. There was no such understanding between the petitioner and Howard. The petitioner merely agreed that if Howard should succeed in selling the 6,000 shares of The Insurance Corporation stock it would, upon the happening of that contingency, pay him a bonus of $25,000. In the opinion of the Board no portion of the $25,000 was a proper deduction from gross income for 1919 as an incurred expense. *Appeal of Wm. J. Ostheimer*, 1 B. T. A. 18; *Appeal of Consolidated Asphalt Co.*, 1 B. T. A. 79; *Appeal of Uvalde Co.*, 1 B. T. A. 932;

*Appeal of Morrison-Ricker Mfg. Co.*, 2 B. T. A. 1008; *Appeal of Gude Brothers, Kieffer Co.*, 2 B. T. A. 1029.

We are of opinion that the amount of $2,562.50, representing the face value of interest-bearing promissory notes given by purchasers of stock and held by the petitioner on December 31, 1919, should be included in determining the profit upon the stock sold during the year. The petitioner had the right under its contract with The Insurance Corporation to endorse these notes to that corporation and receive credit on its obligations for their face value, and this was done in many cases. The petitioner entered the notes upon its books as " accounts receivable " and accrued a profit of $12.50 a share on each share of stock sold, and the Commissioner has made his determination upon this basis.

We are of opinion that the petitioner realized no taxable gain when it purchased its own preferred stock at a cost to it of $5,025 less than its stockholders had theretofore paid for it. This was wholly a capital transaction. *Appeal of Simmons & Hammond Mfg. Co.*, 1 B. T. A. 803; *Appeal of F. Tinker & Sons Co.*, 1 B. T. A. 799; *Appeal of Farmers Deposit National Bank*, 5 B. T. A. 520; *Appeal of Interurban Construction Co.*, 5 B. T. A. 529; *Appeal of Ruckman Coal Co.*, 5 B. T. A. 534.

The petitioner's return for 1919 showed a net income of $55,354.53. The difference between this net income and the net income of $42,395.17 which we have found for the year 1919 consists of 1918 profits on the sale of The Insurance Corporation's stock included in the 1919 return, failure to take the proper amount of depreciation for exhaustion, wear and tear of furniture and fixtures, and the $5,025 included by the petitioner as a profit on the purchase of its own stock.

The deficiency should be computed in accordance with the foregoing findings of fact and opinion.

*Judgment will be entered on 15 days' notice, under Rule 50.*